Jeanne CHARTER and Steve, Charter, Petitioners,

and

Darrell Abbott, et al., Intervenors,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent,

and

Charles M. Rein, et al., Intervenors.

Cause No. CV 00–198–BLG–RFC.

United States District Court, D. Montana, Billings Division.

Nov. 1, 2002.

**1122**

## ORDER

CEBULL, District Judge.

### FACTS

This case arose when the Petitioners refused to pay beef checkoff assessments pursuant to The Beef Promotion and Research Act. The Petitioners produce grass-fed beef that is free of hormones, subtheraputic antibiotics, chemical additives, extra water, and irradiation. (Pet. Statement of Uncontroverted Facts ¶ 6). They object to the checkoff-funded program because they are compelled to fund advertisements which do not differentiate between their product and other beef products. On April 26, 2000 Administrative Law Judge Dorthea A. Baker ordered the Petitioners to pay $417.79 in assessments and late fees. Judge Baker also imposed a $12,000 fine. On September 22, 2000 Judicial Officer William G. Jensen denied the Petitioners' petition to reopen the administrative hearing, and he upheld the Administrative Law Judge's decision. The Petitioners and the Intervenor/Petitioners seek judicial review of the administrative decision. They present an argument here that the Petitioners presented at the administrative level: the beef checkoff program constitutes compelled speech and compelled association, both in violation of the First Amendment. The government and the In-

tervenor/Respondents argue that the beef checkoff program is constitutional because 1) the checkoff-funded program constitutes government speech and 2) even if the program is not government speech, it withstands constitutional scrutiny.

## PROCEDURE

The Petitioners initiated this action, seeking a preliminary injunction barring the United States from enforcing the order of the administrative court. Subsequently, the Petitioners moved for judicial review of the administrative decision. Pursuant to Fed.R.Civ.P. 65(a), the Court consolidated the motion for a preliminary injunction with the motion for judicial review. The Court also allowed Parties to intervene in favor of both the Petitioners and the USDA.

Each party moved for summary judgment. The Court heard the motions on April 13, 2002. On August 6, 2002 the Court denied the motions because disputed issues of material fact precluded summary judgment. Specifically, the parties disagree on the amount of control the government exercises over the beef checkoff program. The August 6, 2002 Order scheduled the case for trial; the parties, however, were given the opportunity to stipulate that the case would be submitted for decision, including factual determinations, on the record in this case and the trial transcript in *Livestock Mktg. Assoc. v United States Dep't of Agric.*, CIV 00–1032 at 13 (D.S.D.2002). The parties so stipulated, and the Court is prepared to render its decision. This Order adjudicates the merits of the case and renders the motion for a preliminary injunction moot.

## STANDARD OF REVIEW

To set aside the Secretary of Agriculture's decision to enforce the Beef Promotion and Research Act against the Petitioners, the Court must find the decision to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or determine that the Secretary failed to meet statutory, procedural, or constitutional requirements. *Anchustegui v. United States Dep't of Agric.*, 257 F.3d 1124, 1128 (9th Cir.2001) (*citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The issues presented are constitutional in nature, so a determination that the Act and the Order violate the Constitution is sufficient to overturn the administrative decision.

## BEEF CHECKOFF PROGRAM

The Beef Promotion and Research Act (the Act) can be found at 7 U.S.C. §§ 2901–11. The regulations promulgated under it are found at 7 C.F.R. § 1260. Together, the Act and regulations are known as the beef checkoff program. The program imposes on cattle producers and importers an assessment of $1.00 per head of cattle purchased or imported. 7 C.F.R. § 1260.172. Assessment proceeds fund a nationwide beef promotion and research campaign. 7 U.S.C. § 2901(b). The campaign is administered by the Cattlemen's Beef Promotion and Research Board (the Beef Board), 7 U.S.C. § 2904(2)(A), under the supervision of the Secretary of Agriculture (the Secretary). The most notable output of the checkoff-funded program is the "Beef. It's what's for dinner" slogan.

Pursuant to the Act, the Secretary was required to promulgate a set of regulations, referred to as the Order, necessary to effectuate the Act. 7 U.S.C. § 2904. Within 22 months after issuing the Order, the Secretary was required to conduct a referendum among cattle producers and importers. 7 U.S.C. § 2906(a). The Order was to be terminated if it was not approved by a majority of those voting in

the referendum. Id. The Order was approved and remains in effect.

The Act and Order establish the Beef Board. 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141–151. Members of the Beef Board are appointed by the Secretary after being nominated by a certified state organization. 7 U.S.C. § 2904(1); LMA Trans. at 289 [1]. In the Act, Congress defines which state organizations the Secretary may certify. 7 U.S.C. § 2905(b). The secretary must allow an organization to nominate Beef Board members only after determining the organization meets Congress's criteria. 7 U.S.C. § 2905(a). It is undisputed that the Secretary has rejected applications of organizations that do not meet the statutory criteria. (Resp't Statement of Uncontroverted Facts ¶ 10; Intervenor Rein's Statement of Uncontroverted Facts ¶ 4; Carpenter Decl. ¶ 63; Reese Decl. ¶ 5). It is also undisputed that the Secretary has decertified at least one organization that previously had been certified. (Intervenor Rein's Statement of Uncontroverted Facts ¶ 4; Carpenter Decl. ¶ 63; LMA Trans. at 290–91).

Once certified state organizations nominate persons for membership in the Beef Board, the Secretary appoints members from the list of nominees. 7 C.F.R. § 1260.145; Carpenter Decl. ¶ 65; Reese Decl. ¶ 4. In the past, the Secretary has removed a member of the Beef Board by seeking and accepting that person's resignation. (Resp't Statement of Uncontroverted Facts ¶ 14; Intervenor Rein Statement of Uncontroverted Facts ¶ 6; Carpenter Decl. ¶ 66; Reese Decl. ¶ 4).

From its membership, the Beef Board elects 10 members to serve on the Beef Promotion and Operating Committee (the Operating Committee). 7 U.S.C. § 2904(4)(A). The Operating Committee is comprised of those ten members and 10 beef producers elected by a federation of Qualified State Beef Councils. Id. The Secretary must certify that the producers elected by the federation are directors of a Qualified State Beef Council. Id. The federation of Qualified State Beef Councils elects members of the Operating Committee, but only councils that meet USDA approval may participate in the election.

The Operating Committee is charged by statute and the Order with a number of duties. It develops projects for the promotion and advertising, research, consumer information, and industry information of beef. 7 U.S.C. § 2904(4)(B). It submits those projects to the Secretary for approval. 7 C.F.R. § 1260.169. The projects it effectuates must be designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign beef markets. 7 C.F.R. § 1260.169(a), (b). The Operating Committee must review its projects periodically, and if it finds that any project does not further the purposes of the Beef Promotion and Research Act, it must terminate the project. 7 C.F.R. § 1260.169(c). In its advertisements, the Operating Committee may not reference brand names without the approval of the Beef Board and the Secretary. 7 C.F.R. § 1260.169(d).

The members of the Beef Board also elect a group of members to serve on the Executive Committee which reviews the actions the Operating Committee has taken. (LMA Trans. at 195). It decides whether or not to ratify Operating Committee decisions. Id. at 201–02.

The Beef Board, Operating Committee, and Executive Committee constitute part of the nationwide portion of the beef

---

**1.** This citation refers to the trial transcript from *Livestock Mktg. Assoc. v United States Dep't of Agric.*, CIV 00–1032 at 13 (D.S.D. 2002), which the parties submitted for the Court's consideration.

checkoff program. In addition to the nationwide program, the Act and Order allow for state programs. These programs are administered by Qualified State Beef Councils, and each state may have only one such council. The USDA has defined a Qualified State Beef Council as "a beef promotion entity that is authorized by State statute or a beef promotion entity organized and operating within a State that receives voluntary assessments or contributions; conducts beef promotion, research, and consumer and industry information programs; and that is certified by the [Beef] Board pursuant to this subpart as the beef promotion entity in such State." 7 C.F.R. § 1260.115. (Pet'r Statement of Uncontroverted Facts ¶ 5).

Forty-five of the fifty states have a Qualified State Beef Council. In each of those states, the Qualified State Beef Council collects assessments from producers. The state organization is required to pay 50 cents of each dollar collected to the Beef Board. It may spend the remaining 50 cents on programs in its state, so long as those checkoff-funded programs are consistent with the Act and the Order. The state programs are subject to the same USDA oversight as the Beef Board programs. (LMA Trans. at 313–16). Many Qualified State Beef Councils choose to pay more than 50 cents of each dollar to the Beef Board. Id. at 204, 208, 228–29.

In the five states that do not have a Qualified State Beef Council, the Beef Board is responsible for collecting the assessments, which are entirely retained by the Beef Board. Id. at 217. In addition, the Beef Board receives all assessments collected from beef importers. Id. at 18.

The process by which a checkoff-funded project or advertisement is approved is a complicated one. Twice a year, the Operating Committee solicits ideas from organizations and individual producers. It sends these organizations and producers a series of letters explaining the types of projects that can be funded with beef checkoff dollars, the priorities the Operating Committee considers important, and the long range plan the Beef Board has approved. The ideas received are referred to advisory committees. The advisory committees are comprised of members of the Beef Board, Qualified State Beef Councils, and other industry organizations. If an advisory committee or an organization that qualifies under the Act desires, they may submit an authorization request, which is a formal request for project funding, to the Operating Committee. Id. at 199–200.

The Operating Committee studies the authorization request, considering what the project will accomplish and how much it will cost. Operating Committee meetings always are followed by Executive Committee meetings. If the Operating Committee approves a project, the project is a subject at the Executive Committee meeting, at which the Executive Committee chooses whether or not to ratify the Operating Committee's approval. Id. at 201–02.

If the Executive Committee ratifies approval of a project, the project is submitted to the USDA for approval. Id. at 202. In addition, any checkoff-funded project developed by a Qualified State Beef Council must meet USDA approval. Id. at 295. If the USDA approves the project, the Beef Board or Qualified State Beef Council may fund it with beef checkoff funds. All USDA-approved, checkoff-funded advertising, is owned by the federal government; any patents, copyrights, inventions, or publications developed through the use of beef checkoff funds are the property of the "U.S. Government as represented by the [Beef] Board." 7 C.F.R. § 1260.215.

Pursuant to the Order, projects are submitted to the Secretary for approval. 7 C.F.R. § 1260.169. The Secretary has dele-

gated this responsibility to Barry Carpenter, who is the Deputy Administrator of the Livestock and Feed Administration, an agency within the USDA. One of his job duties is to oversee the checkoff-funded program. Id. at 288. Carpenter has one full-time staff member assigned to the project development process, as well as other staff members when they are needed. Id. at 292.

No project or advertisement generated by the Beef Board becomes public without Carpenter's approval. Id. at 292–93, 295. By statute, this approval comes after the advertisement is created. In reality, USDA representatives are present at every Beef Board meeting, Operating Committee Meeting, and Executive Committee Meeting. Id. at 205, 215, 297, 315. However, these formal contacts between Beef Board members and USDA representatives are a minimal portion of the actual interaction that takes place. Id. at 294. The representatives provide input to the Operating Committee at the early stages of the project development process. Id. at 215, 293–99. Some proposed projects are not developed because the Operating Committee predicts that the Secretary will not approve them. Therefore, most ideas that do not comport with USDA objectives are quelled in their early stages. Id. at 142. Nevertheless, the Secretary has refused advertisements generated by the Beef Board. (Summ. J. Trans. at 48; Resp't Statement of Uncontroverted Facts ¶ 61, Ex. A; Carpenter Decl. ¶ 23; LMA Trans. at 307–08).

USDA interaction with the Qualified State Beef Councils is similar. Carpenter receives calls from Qualified State Beef Councils that have an idea for a project, and thereafter advises them whether or not they may fund the project with beef checkoff assessments. This prevents the state organizations from wasting time on

projects that he ultimately will reject. Id. at 294–95.

Occasionally, the USDA creates an initiative to use checkoff funds to convey a certain message and urges Qualified State Beef Councils to participate. One such initiative concerned minority farmers and minority livestock producers. At Carpenter's urging, the Qualified State Beef Councils participated in the initiative. Id. at 295–96.

## DISCUSSION

### I. *Does the Beef Checkoff Program Invoke the First Amendment?*

██ Two Supreme Court cases have addressed whether agricultural marketing programs invoke First Amendment scrutiny: *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) and *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). However, two earlier Supreme Court cases, *Abood v. Detroit Bd. of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), and *Keller v. State Bar of Cal.*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), lay the groundwork for the agricultural marketing cases. Therefore, a discussion of *Abood* and *Keller* must precede the discussion of *Wileman Brothers* and *United Foods*.

### A. *Abood* and *Keller*

In *Abood*, the State of Michigan enacted legislation authorizing a system for union representation of local government employees. The union passed a rule requiring employees represented by the union, even though they were not members of the union, to pay a service fee equal to union dues. *Abood*, 431 U.S. at 211, 97 S.Ct. 1782. Failure to pay the service fee was grounds for discharge. Employees who objected to the union activities did not pay

the fee, and they challenged the constitutionality of the program.

The employees' legal theory was that the union engaged in economic, political, professional, scientific, and religious activities not related to collective bargaining, and non-member service fees helped pay for those activities. The Supreme Court's decision did not prohibit the union from engaging in activities not germane to collective bargaining. Instead, it required the union to separate member dues from funds provided by non-members, and decided that non-member funds could not be used to fund activities that are not germane to collective bargaining. *Id.* at 235–36.

A main theme in *Abood* was that regulation of labor relations with state and local employees fell within the power of states under the National Labor Relations Act. *See Id.* at 223. The Court deferred to the Michigan Legislature, which determined that a union was the proper way to protect the employment rights of state employees. Since collective bargaining was the purpose of the legislation, and the union's political activities were not germane to the purpose behind the legislation, employees who disagreed with the political activities could not be compelled to support them.

When the Supreme Court decided *Keller*, it reiterated the rule set forth in *Abood*. In *Keller*, members of the California State Bar sued the Bar, claiming use of their dues to fund ideological and political activities violated the First Amendment. 496 U.S. at 4, 110 S.Ct. 2228. The California Bar is created by California law, and its legislative purpose is to promote the improvement of the administration of justice. California statute sets out the functions the Bar performs, including examining applicants for admission, formulating rules of professional conduct, disciplining members, preventing unlawful practice, and recommending changes in procedural

law and the administration of justice. The Bar-member plaintiffs disputed activities such as lobbying the legislature and other government agencies, filing amicus curiae briefs in pending cases, holding an annual conference where current issues were discussed, passing resolutions regarding those current issues, and engaging in a variety of education programs. *Id.* at 4–5, 110 S.Ct. 2228. In short, the Bar was taking positions on controversial, political and ideological issues. *See Id.* at 6 n. 2, 110 S.Ct. 2228.

In *Keller*, the Supreme Court followed *Abood* and held that the Bar may compel association only for the purposes provided by the California Legislature. Further, it may fund only activities that are germane to the statutory purposes. *Id.* at 13–14, 110 S.Ct. 2228.

### B. *Wileman Brothers* and *United Foods*

*Wileman Brothers* and *United Foods* both addressed the constitutionality of agricultural marketing programs, and in both cases, the Supreme Court relied on *Abood* and *Keller*. Specifically, the Court derived a two-part test which determines whether an agricultural marketing program invokes scrutiny under the First Amendment. To avoid such scrutiny, the program must compel speech that is 1) non-ideological and 2) germane to a larger regulatory scheme.

In *Wileman Brothers & Elliott, Inc.*, California fruit farmers were subject to a series of agricultural orders promulgated by the USDA. 521 U.S. at 460, 117 S.Ct. 2130. Among other mandates, the agricultural orders exempted the fruit growers from antitrust laws, collectivized fruit sales, set prices, set rules for marketing, and required fruit farmers to contribute funds used for cooperative advertising. *Id.* at 469, 117 S.Ct. 2130. The Court

determined that the agricultural orders reflected a policy of displacing unrestrained competition with government-supervised cooperative marketing. *Id.* at 475, 117 S.Ct. 2130. The basic policy decision underlying the statutory scheme was that, considering the volatile markets for agricultural commodities, the public is best served by compelled cooperation among producers. *Id.* In evaluating the constitutionality of compelled support for advertising, the Supreme Court utilized the two-step analysis employed in *Abood* and *Keller.* The Court found the compelled support for advertising did not raise a First Amendment claim because 1) the generic advertising of California tree fruit was unquestionably germane to the purposes of the marketing orders which collectivized the industry and 2) the assessments were not used to fund ideological activities. *Id.* at 473, 117 S.Ct. 2130. It wrote:

> The mere fact that objectors believe their money is not being well spent 'does not mean [that] they have a First Amendment complaint.'

*Id.* at 472, 117 S.Ct. 2130 (*quoting Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)).

Four years after *Wileman Brothers,* the Supreme Court decided *United States v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). In that case, the Court reviewed the Mushroom Promotion, Research, and Consumer Information Act of 1990, 7 U.S.C. § 6101 *et seq.* Unlike the compelled support for speech in *Wileman Brothers,* the compelled support for mushroom advertising was not part of a larger regulatory scheme. *United Foods,* 533 U.S. at 412–13, 121 S.Ct. 2334. Mushroom producers were not bound together and required to market their products according to cooperative rules. *Id.* at 412, 121 S.Ct. 2334. Instead, the central purpose of the Mushroom Promotion, Research, and Consumer Information Act was generic advertising.

Again the Court utilized the two-step approach from *Abood* and *Keller.* Differentiating the case from *Wileman Brothers,* the Supreme Court wrote:

> The opinion and analysis of the [*Wileman Brothers*] Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.
>
> . . . .
>
> The features of the marketing scheme found in [*Wileman Brothers*] are not present in the case now before us. As respondent notes, and as the Government does not contest [citation omitted], almost all the funds collected under the mandatory assessments are for one purpose: generic advertising. Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from antitrust laws, and nothing preventing individual producers from making their own marketing decisions.

*Id.*

The Court decided that, because mushroom advertising was not germane to a larger regulatory scheme, compelled support for mushroom marketing invoked the protections afforded by the First Amendment. *Id.* at 414–16, 121 S.Ct. 2334. Because the government did not provide a viable First Amendment argument to support the checkoff-funded mushroom advertising, the Court determined the Mushroom Promotion, Research, and Consumer Information Act was unconstitutional.

## C. Application of *Wileman Brothers* and *United Foods*

*Wileman Brothers* and *United Foods* set forth a two-part test to determine whether an agricultural marketing program is subject to First Amendment scrutiny. The Beef Promotion and Research Act is subject to scrutiny if 1) it compels ideological speech or 2) it is not germane to a larger regulatory scheme. Since the Act compels support for beef advertising only, no claim has been made, and no credible claim could be made, that the checkoff-funded program compels ideological speech. Therefore, the inquiry must focus on whether beef checkoff advertising is germain to a larger regulatory purpose.

As written, the Beef Act and Order are quite similar to the Mushroom Act and Order. Nothing in the briefs indicates that the programs are substantially different, and at the hearing on this matter, no differences were demonstrated. Evidence on this issue is notably absent from the record, and the Court is unable to properly compare the beef and mushroom promotion programs.

Nevertheless, the purpose of the Beef Act is the promotion and advertising, research, consumer information, and industry information of beef. 7 U.S.C. § 2904(4)(B). Though the Court has been presented with varying figures, the beef checkoff assessments generate approximately $80–87 million per year. In its brief in opposition to the motion for preliminary injunction, the USDA stated that $32 million has been spent on research since the inception of the program. Thirty-two million dollars amounts to a fraction of one percent of the total assessments that have been collected. Like the mushroom promotion program, the great percentage of the funds collected under the assessments are utilized for generic advertising. Beef producers are not exempted from antitrust laws, and nothing in the program prevents individual beef producers from making their own marketing decisions. Therefore, the beef checkoff program is not germane to a larger regulatory scheme, and it is subject to First Amendment constraints. The checkoff-funded program is constitutional only if it passes First Amendment scrutiny.

## II. *Government Speech*

Having decided that the Petitioners and Intervenor/Petitioners have raised a First Amendment Claim, the Court must decide whether the beef checkoff program violates the rights of free speech or free association. The main argument asserted by the USDA and the Intervenor/Respondents is that the checkoff-funded program is constitutional government speech.

### A. The Government Speech Doctrine

There is no doubt that the government speech doctrine is recognized by the Supreme Court and the Ninth Circuit. A government agency may use revenue, whether derived from taxes, dues, fees, tolls, tuition, donations, or other sources for any purposes within its authority. To effectively govern, it must take substantive positions and decide disputed issues. So long as it bases its actions on legitimate goals, the government may speak despite citizen disagreement with the content of the message. *Keller v. State Bar of Cal.*, 496 U.S. 1, 10, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990).

The government is not required to be content-neutral. *Id.* "When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Board of Regents of the University of Wisconsin*

*System v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). The government may fund viewpoint-based speech when the government itself is the speaker. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). It also may use private speakers to disseminate specific messages pertaining to government programs. *Id.; Rosenberger v. Rector and Visitors of the Univ. of Vir.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

### B. *United Foods* and *Wileman Brothers* did not consider government speech.

Before addressing whether the beef checkoff program is government speech, it should be noted that, in both *Wileman Brothers* and *United Foods*, the Supreme Court declined to consider government speech arguments because such arguments either were not properly raised or were not raised at all. In *Wileman Brothers*, the government did not argue that the advertising at issue amounted to government speech. 521 U.S. at 483, 117 S.Ct. 2130 (J. Souter *concurring*). In *United Foods*, the government attempted to raise the issue of government speech, for the first time, on appeal to the Supreme Court. The Court declined to address the question because it had not been raised before the lower courts. *United Foods*, 533 U.S. at 416–17, 121 S.Ct. 2334. It is obvious that both *Wileman Brothers* and *United Foods* were decided without considering whether the agricultural marketing programs amounted to government speech.

### C. Cases Addressing the Beef Checkoff and Government Speech

In 1989 the Third Circuit Court of Appeals concluded that the advertising compelled by the Beef Promotion and Research Act did not constitute government speech. *United States v. Frame*, 885 F.2d 1119, 1133 (3rd Cir.1989). *Frame* was de-cided years before *Wileman Brothers* or *United Foods.*

In *Frame*, the Third Circuit acknowledged that the issue of whether the beef checkoff program compelled government, rather than private, speech was a close one. *Id.* at 1132. The court concluded that the amount of government oversight in the checkoff-funded program was considerable, and that the Beef Board was subject to the Secretary's pervasive surveillance and authority. *Id.* at 1128. The court further noted that members of the Beef Board are appointed by the Secretary. 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b). The Secretary also has the power to remove members of the Beef Board. 7 C.F.R. §§ 126.211(b)(1), 213. The Beef Board must give notice of its meetings to the Secretary so that the Secretary or his representative may attend the meetings. 7 C.F.R. §§ 1260.150(m). The Beef Board is required to submit to the Secretary for each fiscal period an audit of its activities. 7 C.F.R. 1260.150(a). All budgets, plans, projects, and contracts approved by the Beef Board become effective only upon approval by the Secretary. 7 U.S.C. § 2904(4)(C), (6)(A), (6)(B); 7 C.F.R. §§ 1260.150(f), (g); 7 C.F.R. § 1260.168(e), (f). Congress has set the beef checkoff assessments, and the Secretary decides how the funds will be spent. *Frame*, 885 F.2d at 1129.

In acknowledging that the argument for classifying the beef checkoff program as government speech was based on sound reasoning, the Third Circuit noted that the nexus between the Beef Board and the USDA was a close one. *Id.* at 1131–32. The Frame court recognized that, when the Beef Board spoke, it did so on behalf of the Secretary of Agriculture and the government of the United States. *Id.* at 1132. Despite each of these findings, the *Frame* panel arrived at the strained con-

clusion that the Beef Promotion and Research Act did not constitute government speech. *Id.*

The Third Circuit relied heavily on footnote 13 of Justice Powell's *Abood* concurrence, which states:

> Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative of only one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

*Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. 1782 (J. Powell concurring); *see Frame* 885 F.2d at 1132–33. The *Frame* court found that the Beef Board is representative of one segment of the population, with certain common interests.[2] In addition, members of the Beef Board, although appointed by the Secretary, are private individuals nominated by beef industry organizations. *Frame,* 885 F.2d at 1133. Finding a close nexus between the individuals who fund the checkoff advertising and the message dispersed in the advertisements, the court labeled the beef checkoff program a self-help program, rather than government speech. *Id.* at 1132–33.

The Third Circuit's extensive reliance on Justice Powell's footnote was misplaced for at least two reasons. First, Justice Powell's concurring opinion is not binding law. His opinion actually is a dissent, rather than a concurrence, because he obviously disagrees with the majority opinion. The *Abood* majority held that the union could not fund political or ideological expression with assessments collected from non-member employees. *Abood,* 431 U.S. at 235–36, 97 S.Ct. 1782; *Abood,* 431 U.S. at 245, 97 S.Ct. 1782 (J. Powell concurring). Justice Powell, on the other hand, would have decided that all collective bargaining is political expression. *Abood,* 431 U.S. at 257, 97 S.Ct. 1782 (J. Powell concurring). In his view, any coerced funding for collective bargaining violated the First Amendment. *Id.* at 259, 97 S.Ct. 1782.

Second, relying heavily on footnote 13 was unsound because *Abood* is not a government speech case. The lesson *Abood* teaches is that, when individuals are coerced to fund an association that represents them, the association's speech does not violate the First Amendment, so long as the speech falls within the statutory purpose for which the association was created. In *Abood,* the protected activities were political and ideological activities not germane to the union's statutory purpose. The speech the *Frame* court addressed, generic beef advertising, clearly falls within the purpose of the Beef Promotion and Research Act. 29 U.S.C. § 2901(b). The Third Circuit should have analyzed *Frame* under the majority opinion in *Abood,* rather than a footnote in a concurring opinion.

**2.** This finding comes in direct conflict with other findings in the *Frame* opinion. A number of those findings can be found in the following passage: "In this case, the national interest in maintaining and expanding beef markets proves similarly compelling. Widespread losses and severe drops in the value of inventory have driven many cattlemen to bankruptcy, as well as to the abandonment of ranching altogether. A continuation of this trend would endanger not only the country's meat supply, but the entire economy." *Frame,* 885 F.2d at 1134 (citations omitted). This language indicates that beef advertising benefits the nation as a whole, not only beef producers.

The only substantive issue on which the *Abood* majority and Justice Powell agree is the disposition of the case. For starkly different reasons, both opinions conclude that the allegations in the complaint, if proven, would establish a constitutional violation. *Abood,* 431 U.S. at 237, 97 S.Ct. 1782; *Abood* 431 U.S. at 244, 97 S.Ct. 1782 (J. Powell concurring). When the *Frame* court relied on footnote 13 of the concurring opinion, rather than the majority ruling, it ignored binding Supreme Court precedent.

However, it should be emphasized that, even though the Third Circuit concluded the beef checkoff program did not constitute government speech, it upheld the constitutionality of the program. The court determined that beef checkoff advertising was commercial speech, subject to the less stringent standard set forth in *Central Hudson.*[3] Nevertheless, compelled association had also been raised, so the court analyzed the checkoff program under the heightened standard of scrutiny employed in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Government interference with association rights must be "justified by compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Frame,* 885 F.2d at 1134 (*quoting Roberts,* 468 U.S. at 623, 104 S.Ct. 3244.)

First, in its analysis under *Roberts,* the *Frame* court found the governmental interest in advertising beef was compelling for the following reasons: 1) it prevents further decay of an already deteriorating beef industry; 2) its primarily economic interest does not diminish its importance; 3) its establishment of industrial harmony—although an economic interest—is sufficiently important to justify significant intrusions on the producers' right to associate; 4) it promotes the national interest in maintaining and expanding beef markets; 5) widespread losses and severe drops in the value of beef have driven many cattlemen to bankruptcy, as well as to the abandonment of ranching altogether; 6) a continuation of the abandonment of ranching endangers not only the country's meat supply, but the entire economy; and 7) maintenance of the beef industry ensures preservation of the American cattlemen's traditional way of life. *Id.* at 1134–35. Second, the court found that the Beef Promotion and Research Act is ideologically neutral. *Id.* at 1135. Third, the court determined that the Act's interference with First Amendment rights is slight. The Beef Board is authorized only to engage in commercial speech on behalf of beef producers, and may not engage in ideological or political expression. *Id.* at 1136.

Based on its findings, the *Frame* court concluded that the slight interference resulting from the Beef Promotion and Research Act does not violate cattle producers' right of free association. *Id.* at 1137. Because the Act passes the stricter *Roberts* test, it also survives the less stringent commercial speech test. *Id.* at 1134 n. 12.

In recent years, two district courts have followed the *Frame* analysis and decided advertising funded with beef checkoff dollars is not government speech: *Goetz v. Glickman,* 920 F.Supp. 1173 (D.Kan.1996) and *Livestock Mktg. Assoc. v United*

---

**3.** In commercial speech cases, courts apply a four-element analysis. First, the expression must be protected by the First Amendment. Second, the asserted governmental interest must be substantial. If elements one and two are satisfied, a court applies a third and fourth. Third, the regulation must directly advance the governmental interest asserted. Fourth, the regulation must not be more extensive than is necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

*States Dep't of Agric.,* CIV 00–1032 (D.S.D.2002) (unpublished)[4]. It is not necessary for this Court to discuss each case in detail because both followed the analysis in *Frame. Goetz,* 149 F.3d 1131, 1134 (10th Cir.1998); *Livestock Mktg. Assoc.* at 818. In *Goetz,* the Tenth Circuit affirmed the district court's decision that the Beef Promotion and Research Act was constitutional. Though the district court found the Act was constitutional under the *Frame* analysis, the Court of Appeals did not follow the district court's analysis. Instead, it passed on the government speech issue and relied on *Wileman Brothers.*[5] *Goetz,* 149 F.3d at 1139. In *Livestock Marketing Association,* the Southern District of South Dakota relied on *Frame* and decided the checkoff-funded program is not government speech. It concluded the program is unconstitutional under *United Foods. Livestock Mktg. Assoc.* at 821.

Each of the courts that determined the Beef Board does not deliver a government message relied on *Frame.* The reasons noted in this Order that the *Frame* court's decision is not persuasive apply to those courts' decisions as well. A third reason those courts' decisions are unpersuasive is undoubtedly the most convincing. Both courts failed to follow the government speech cases the Supreme Court issued after *Keller.* It was not until the 1990's that the Supreme Court established a body of case law defining government speech. *Frame,* a Third Circuit opinion decided in 1989, can not serve as the sole basis for a government speech analysis.

### D. Private Individuals Disseminating Government Speech

Although when *Frame* was decided in 1989 the government speech issue may have been a close call, it is no longer so.

The most recent Supreme Court and Ninth Circuit decisions discussing government speech indicate that the checkoff-funded programs do constitute government speech. The Act creates programs where the government utilizes private cattlemen to disseminate a single message, a message prescribed by Congress and the USDA. The extent of control Congress and the USDA exercise over the beef checkoff program is extensive, as is previously discussed herein. Coerced promotion of beef would not exist had Congress not mandated it. "Beef. It's what's for dinner" would not be a recognizable slogan but for the approval of the Secretary. The federal government created and controls the beef checkoff program, and the Supreme Court has held that when private individuals deliver a government message, the message may be attributed to the government.

In 1991, after both *Frame* and *Keller* were issued, the Supreme Court decided *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). In *Rust,* Congress and the Department of Health and Human Services created a program that funded family planning. The legislation required that funds not be distributed to programs where abortion was used as a method of family planning. 42 U.S.C. § 300a–6. Family planning programs and doctors sued Health and Human Services on First Amendment grounds. *Rust,* 500 U.S. at 177–79, 111 S.Ct. 1759.

The family planning programs and the doctors contended that withholding funding from programs that discussed abortion was unconstitutional because it discriminated against a particular viewpoint. However, the Court relied on *Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), which held that the government has no

---

4. The Court cites *Livestock Mktg. Assoc.* to demonstrate a conflict among dispositions. *See* 9th Cir. R. 36–3(b).

5. The Tenth Circuit's issued *Goetz* after *Wileman Brothers,* but before *United Foods.*

obligation to subsidize speech rights. The government is permitted to make a value judgment regarding policy, and may implement that judgment by allocating public funds. The family planning program did not discriminate on the basis of viewpoint. Instead, the government chose to fund one type of activity over another, and it utilized private speakers to promote the activity.

Although *Rust* does not address the exact issue presented here, its reasoning supports the constitutionality of the beef checkoff program. *Rust* addresses alleged government suppression of speech by withholding funds. Basically, the Court decided that choosing not to fund speech does not constitute suppression of that speech. Here, to the contrary, the government is accused of compelling cattle producers and importers to speak. In *Rust*, the Court wrote, "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." 500 U.S. at 193, 111 S.Ct. 1759 (*quoting Maher v. Roe*, 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)). In that case, the government was funding private speech that encouraged full-term childbirth. In this case, the government compels funding for speech encouraging the sale and purchase of beef. The sale and purchase of beef is consonant with legislative policy. 7 U.S.C. § 2901.

The Supreme Court did not explicitly decide *Rust* on government speech grounds. However, later Supreme Court cases have explained *Rust* in a government speech context. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). Viewpoint-based funding decisions can be upheld when the government uses private speakers to transmit specific information pertaining to government programs. *Id.; Rosenberger v. Rector and Visitors of the Univ. of Vir.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

In 2000, the Supreme Court considered facts analogous to those in this case and decided the speech involved was government speech. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302–03, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). Prior to 1995, a student delivered a prayer before every Santa Fe High School home football game. The families of two students sued based on the Establishment Clause. During the litigation, the high school adopted a policy that permitted, but did not require, a student-led prayer before home football games. The district court entered an order modifying the policy to permit only nonsectarian, nonproselytizing prayer. It required the students to choose the text of the prayer, and prohibited school officials from interfering with the text. The Fifth Circuit held that the policy, even as modified, violated the Establishment Clause.

One issue before the Supreme Court was whether the prayer was government or private speech. The school district relied on *Rosenberger*, arguing that a government-created forum is not government speech. The Court rejected the argument because the pre-game prayer was not the type of forum discussed in *Rosenberger*. It wrote:

> In this case the District first argues that [the government speech] principle is inapplicable to its October policy because the messages are private student speech, not public speech. It reminds us that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Board of Ed. of Westside Community Schools (Dist.66) v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (opinion of O'CONNOR, J.). We

certainly agree with that distinction, but we are not persuaded that the pregame invocations should be regarded as "private speech."

These invocations are authorized by a government policy and take place on government property at government-sponsored school-related events. Of course, not every message delivered under such circumstances is the government's own. We have held, for example, that an individual's contribution to a government-created forum was not government speech. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Although the District relies heavily on *Rosenberger* and similar cases involving such forums, it is clear that the pregame ceremony is not the type of forum discussed in those cases. The Santa Fe school officials simply do not "evince either 'by policy or by practice,' any intent to open the [pregame ceremony] to 'indiscriminate use,' ... by the student body generally." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 270, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (*quoting Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Rather, the school allows only one student, the same student for the entire season, to give the invocation. The statement or invocation, moreover, is subject to particular regulations that confine the content and topic of the student's message. This level of state involvement rendered the prayer government speech. *Id.*

Prior to the decision, the school district had attempted to disentangle itself from the prayer through the adoption of a two-step election process. In the first election, the student body voted in favor of a prayer to precede football games; in the second, they chose two students to deliver the prayers. *Id.* at 296, 120 S.Ct. 2266.

The Court held that the election process was not sufficient to create a forum where students engaged in private speech. The elections took place only because the school district policy permitted students to deliver a brief invocation and/or message. In addition, the school district required the elections. The Court analyzed the words of the policy and decided, though the word "prayer" was not used, the policy indicated that the message should be religious. *Id.* at 305–07, 120 S.Ct. 2266.

The beef checkoff program is similar to the prayer in *Santa Fe Indep. Sch. Dist.* The USDA is analogous to the school district. The Beef Board, along with the cattle producers and importers who support the checkoff-funded program, are analogous to the majority of students who supported the prayers. The Beef Board and Qualified State Beef Councils play the same role as the student elected to recite the prayer. The Petitioners are analogous to the students who opposed the prayers.

In *Santa Fe Indep. Sch. Dist.*, the school district dictated the type of speech the students would engage in, even though the students chose the actual text. This is similar to Congress's and the USDA's relationship with the Beef Board and the Qualified State Beef Councils. In addition, beef checkoff funds are not opened up to indiscriminate use by cattle producers of all points of view. *Santa Fe Indep. Sch. Dist.* demonstrates that the beef checkoff program is government speech. If the pre-game prayer was government speech, then "Beef. It's what's for dinner" must be.

The parties that object to the checkoff-funded program have argued that the referendum process found in the Act renders the program a private, rather than government-initiated, program. In light of *Santa Fe Indep. Sch. Dist.*, this argument fails. Within 22 months after the issuance of the Order, the Secretary was required to con-

duct a referendum among cattle producers and importers. 7 U.S.C. § 2906(a). If the Order was not approved by a majority of those voting in the referendum, the Secretary was required to terminate both the collection of assessments and the Order. *Id.* When the Secretary conducted the referendum, the Order was approved by a large majority of voters, and the checkoff-funded program remained in place.

The referendum was nearly identical to the student vote in *Santa Fe Indep. Sch. Dist.* Just as the school district required a vote on whether a pre-game message would be delivered, Congress required that the referendum be conducted to determine if the Order would remain effective. Further, the school district indicated that the pre-game message should be religious. In this case, Congress mandated that beef checkoff funds should be used to strengthen, maintain, and expand beef markets. The election process in *Santa Fe Indep. Sch. Dist.* was not enough to convert government speech into private speech. The same is true of the referendum process found in the Act.

The parties objecting to the beef checkoff also argue that the process allowing for an additional referendum gives control of the checkoff program to producers. The Act states that, after the initial referendum, the Secretary may conduct an additional referendum if a group comprising 10 percent of cattle producers requests one. 7 U.S.C. § 2906(b). If the Secretary conducts such a referendum, and a majority of voting producers favor termination or suspension of the Order, the Secretary must terminate or suspend the Order. *Id.* Based on this portion of the Act, the ob-

jecting parties assert that producers and importers retain the ability to conduct a referendum. *(See for example* Petitioners' Statement of Genuine Issues ¶ 3). The assertion is based on a misreading of the statute. 7 U.S.C. § 2906(b) states that the Secretary, not producers, has the ability to conduct an additional referendum. If less than 10 percent of producers request a referendum, the Secretary may not conduct one. If 10 percent or more request a referendum, the Secretary may, but is not required, to conduct one. Clearly, the additional referendum process provides producers with less control over the checkoff-funded program than the initial referendum process. It also grants less control to private parties than the election process in *Santa Fe Indep. Sch. Dist.*

*Santa Fe Indep. Sch. Dist.* is a Supreme Court, government-speech case that was decided in 2000. The case is factually similar to this one, and is binding on this Court. There is no reason to return to the *Frame* analysis, which was suspect in 1989 and is inconsistent with more recent Supreme Court case law.

Following *Frame* also would be inconsistent with the Ninth Circuit's treatment of government speech. The Court of Appeals decided *Downs v. Los Angeles Unified Sch. Dist.* in 2000. 228 F.3d 1003 (9th Cir.2000). The case arose after the Los Angeles Unified School District issued a memorandum designating June as Gay and Lesbian Awareness Month. The memorandum informed schools within the district that certain outside organizations would provide posters and materials in support of Gay and Lesbian Awareness Month [6]. In June of each year, school

---

**6.** The outside organizations were the Office of Intergroup Relations and Multicultural Unit, Division of Instructional Services, and the Gay and Lesbian Education Commission. Before the materials provided by these organizations were posted, groups such as the

Parent Community Services Branch reviewed them. *Downs,* 228 F.3d 1003. The opinion does not indicate whether these organizations were divisions of government or private groups. *See Id.* at 1007 n. 1.

staff members created a bulletin board, on which faculty and staff could post materials related to Gay and Lesbian Awareness Month. Staff were not required to obtain approval before posting on the bulletin boards, but the school principals had ultimate authority to control the contents of the boards. The school principals who oversaw the bulletin boards were accountable to the school district. *Id.* at 1005–06.

The staff at Leichman High School posted material on their bulletin board that was pro-diversity and tolerant of gays and lesbians. A teacher at the high school who opposed Gay and Lesbian Awareness Month created his own bulletin board, titled "Testing Tolerance" in June of 1997. In June of 1998, he created a bulletin board titled "Redefining the Family," on which he posted the Declaration of Independence, newspaper articles, school district memoranda, surveys, and biblical quotes. Obviously, the teacher's bulletin boards did not support Gay and Lesbian Awareness Month. The principal ordered the teacher's materials to be removed because they did not promote tolerance or diversity, and the teacher sued on First Amendment grounds. *Id.* at 1006–07.

The Ninth Circuit Court of Appeals held that the Gay and Lesbian Awareness bulletin boards disseminated government speech. *Id.* at 1012. Outside organizations provided the materials on the board, and faculty and staff posted them. Postings were subject to the oversight of the principals. The school district was directly responsible for recognition of Gay and Lesbian Awareness Month and the content of the bulletin board. Since the bulletin board was government speech, not a public forum supporting private speech, the school district was not required to be viewpoint neutral. The Constitution did not require the school district to allow the teacher to maintain his own bulletin board.

*Downs* is directly on point. The school district required that the materials posted on the bulletin boards transmitted a particular government message: tolerance for gays and lesbians. Congress was equally unambiguous when it limited the use of beef checkoff funds to the promotion of beef. In *Downs*, the school principals maintained authority over the contents of the bulletin boards, but materials did not need to be approved before being posted. *Id.* at 1006. Therefore, the principals were less involved in generating gay and lesbian tolerant speech than the Secretary is involved in generating beef advertising.

The checkoff-funded program allows the private cattlemen who comprise the Beef Board to generate the promotion and research. That fact notwithstanding, the Secretary has the final authority to approve or reject the contents of a Beef Board project. LMA Trans. at 141–42. The Secretary exercises pervasive surveillance and authority over the Beef Board. *Frame*, 885 F.2d at 1128. The Secretary appoints members of the Beef Board. 7 U.S.C. § 2904(1); 7 C.F.R. § 1260.141(b). He also retains the power to remove members from the Beef Board. 7 C.F.R. §§ 126.211(b)(1), 213. The Beef Board is required to give notice of its meetings to the Secretary, so that the Secretary or a representative may attend the meetings. 7 C.F.R. §§ 1260.150(m). A USDA representative does, in fact, attend every Beef Board, Operating Committee, and Executive Committee meeting. LMA Trans. at 205, 215. The Beef Board is required to submit to the Secretary for each fiscal period an audit of its activities. 7 C.F.R. 1260.150(a). All budgets, plans, projects, and contracts approved by the Beef Board become effective only upon approval by the Secretary. 7 U.S.C. § 2904(4)(C), (6)(A), (6)(B); 7 C.F.R. §§ 1260.150(f), (g); 7 C.F.R. § 1260.168(e), (f). If the Secretary determines that a checkoff-funded project

does not serve the purpose of the Act, he denies funding for the project. LMA Trans. at 192, 312–13. The government mandates the beef checkoff assessments, and the Secretary of Agriculture maintains control over how the assessments are spent.

As one example of the control over speech the Beef Board generates, the Secretary has rejected an advertisement proposed by the Operating Committee. (Summ. J. Trans. at 48; Resp't Statement of Uncontroverted Facts ¶ 61, Ex. A; Carpenter Decl. ¶ 23). That advertisement was a statement to the effect of, "Did you ever notice that when a person offers you a strange food, it tastes like chicken?" (Summ. J. Trans. at 48). The USDA refused this proposed advertisement because it has an interest in promoting, not disparaging, poultry. (Resp't Statement of Uncontroverted Facts ¶ 61, Ex. A; Carpenter Decl. ¶ 23).

By no means is the government's control over the checkoff-funded program *pro forma*. USDA representatives interact and advise the Beef Board throughout the project development process. LMA Trans. at 215, 293–99. The representatives are present at every Beef Board meeting, Operating Committee Meeting, and Executive Committee Meeting. Id. at 205, 215, 297, 315. But presence at these formal meetings represents only a small portion of the contacts the USDA has with Beef Board members. Id. at 294. As a result of the USDA's continuing presence, most Beef Board projects that Carpenter would not have approved are abandoned in their early stages. Projects being developed by Qualified State Beef Councils often meet the same fate.

The Secretary of Agriculture, by way of his staff, controls the checkoff-funded speech. Therefore, the speech must be attributed to the government. In fact, any patents, copyrights, inventions, or publica-

tions developed through the use of beef checkoff funds are the property of the "U.S. Government as represented by the [Beef] Board." 7 C.F.R. § 1260.215. This regulation demonstrates two important points. First, the federal government owns the projects and advertisements generated with beef checkoff funds. Second, the Beef Board is a representative of the government.

Congress created the Beef Promotion and Research Act for the express purpose of "maintenance and expansion of existing markets for beef." 7 U.S.C. § 2901(a)(4). It intended to "maintain and expand domestic an foreign markets and uses for beef and beef products." 7 U.S.C. § 2901(b). Congress determined that financing a "program of promotion and research designed to strengthen the beef industry's position in the marketplace" serves the public interest. Id. Unlike the activities challenged in *Abood* and *Keller*, the Beef Board's activities fall squarely within these legislative mandates. Through the Act, Congress and the USDA use private speakers to disseminate a government message. This is a recognized form of government speech. *Rust*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233; *Legal Servs. Corp.*, 531 U.S. at 541, 121 S.Ct. 1043.

### E. Public Forums

The Petitioners contend that the beef checkoff program is not government speech, but instead, is a public forum which allows for private speech. (*See for example* Summ. J. Trans. at 26, 85). The public forum cases do not support the Petitioners' position. In 1995 the Supreme Court decided *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). In that case, an Ohio law made an area known as Capitol Square a forum for pub-

lic questions and activities. The Ku Klux Klan completed a required application, seeking to place a cross in the square during the Christmas season. The Capitol Square Review and Advisory Board denied the application on Establishment grounds. The Supreme Court decided that allowing the cross would not violate the Establishment Clause because the government was merely providing a forum. Ohio was not engaging in government speech by providing a public forum.

The decision that Ohio was not engaging in government speech clearly is distinguishable from the checkoff-funded program. In *Capitol Square*, the Court considered an Ohio statute which set aside a public square as a public forum. The statute made the square available "for use by the public . . . for free discussion of public questions, or for activities of a broad public purpose." Ohio Admin. Code Ann. § 128–4–01(A) (1994). After obtaining a permit, people in Ohio who possessed all types of political and religious views could voice their opinions in the square.

In contrast, the Beef Board was created for one specific congressional purpose—to promote the sale of beef. It would be disingenuous to suggest that the Ku Klux Klan could use beef checkoff funds to display Christian symbols during the Christmas season. It is equally ridiculous to assume that animal rights activists could access the beef checkoff fund in an attempt to discourage the slaughter of cattle. Beef assessments may not be used to promote the sale of cotton, dairy, eggs, fluid milk, honey, mushrooms, peanuts, popcorn, pork, potatoes, soybeans, or watermelons—other agricultural products Congress has chosen to promote. *See Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 132 F.Supp.2d 817, 820 (D.S.D. 2001). Without doubt, the Secretary would prohibit the Beef Board from replacing "Beef. It's what's for dinner" with

"Beef will make you fat and raise your cholesterol level." The checkoff-funded program bears little resemblance to a public forum. Instead, the government has chosen to promote government policy. The government disseminates its chosen message by way of private speakers.

Likewise, *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and *Board of Regents of the University of Wisconsin System v. Southworth*, 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), do not apply here. In both of those cases, universities created opportunities for students with varying viewpoints to express those views. Clearly, the public forums in *Rosenberger* and *Southworth* can be distinguished from the beef checkoff program. When Congress created the checkoff-funded program, it chose which individuals may speak and decided what they may say. Because the beef checkoff does not create a public forum, forum analysis and viewpoint neutrality do not apply to this case.

## F. Beef Checkoff Funding

The Petitioners and Intervenor/Petitioners argue that *Keller* controls this case because, like the California Bar, the beef checkoff program is funded with revenues collected from one segment of the general population. (*See for example* Intervenor Abbott's Brief in Opposition to Respondent's Motion for Summary Judgment at 7–9). In *Keller*, however, the government speech issue was a different issue than the Court is faced with here.

In reaching its decision in *Keller*, the Supreme Court decided the challenged activities were not government speech. It did so, however, after finding that the State Bar of California was not a traditional government agency. *Id.* In essence, it concluded that the Bar did not engage in

government speech because it was an association of individuals.

In light of subsequent Supreme Court case law, the *Keller* analysis does not control whether the Beef Board engages in government speech.[7] It is now clear that the government may use private individuals to disseminate a government message. *Rust v. Sullivan*, 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Rosenberger v. Rector and Visitors of the Univ. of Vir.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001).

In *Keller*, the legislation which created the Bar did not provide for any outside control over the Bar's speech; instead, the Bar maintained final authority over its own activities. Because no other government agency exercised control over the Bar's speech, the speech could be characterized as government speech only if the Bar itself was a government agency. Both the Supreme Court of California and the Supreme Court of the United States addressed the issue of whether the Bar was a government agency. *Keller*, 496 U.S. at 4, 10–11, 110 S.Ct. 2228.

In the instant case, the government speech issue to be decided is whether Congress and the USDA exercise sufficient control over private speakers to render the speech that of the government. *Keller* does not discuss this issue so it, as well as its discussion of how government agencies are funded, does not control.

## III. Constitutionality

### A. Government Speech

Because the Beef Board and the Qualified State Beef Councils are groups of private speakers the government utilizes to transmit a specific government message, the beef checkoff funded advertising is attributable to Congress and the USDA. The question remaining is whether the program is constitutionally-sound government speech.

■ So long as government speech does not prohibit or establish religion, the United States Supreme Court recognizes that the government may deliver a content-oriented message. In *Rosenberger*, the Court wrote, "[w]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." 515 U.S. at 833, 115 S.Ct. 2510 (*citing Rust*). Viewpoint-based funding decisions can be sustained in instances in which the government itself is the speaker. *Legal Servs. Corp.*, 531 U.S. at 541, 121 S.Ct. 1043.

■ The Ninth Circuit employs the same doctrine. In *Downs*, the court explained the extent to which the government may control its own speech. The opinion demonstrates that there are few restrictions on government speech. The court wrote:

> We conclude that when a high school is the speaker, its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individual's choice of how to convey oneself: among other things, content, timing, and purpose. Simply because the government opens its mouth to speak does not give every outside individual or group a

---

7. This is not to say that the Bar's coerced support for political and ideological speech was constitutional. Under *Abood, Wileman Brothers*, and *United Foods*, the speech was unconstitutional either because it was political and ideological, or because it was not germane to the Bar's statutory purpose.

First Amendment right to play ventriloquist.

*Id.* at 1013. The court continued:

An arm of local government—such as a school board—may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives.

*Id.* at 1014.

Both the Supreme Court and the Ninth Circuit grant government bodies latitude to engage in content-oriented speech. The Beef Promotion and Research Act is non-ideological, content-oriented government speech which does not violate free speech or free association.

### B. *Central Hudson* Commercial Speech Test

█ The Court has been presented with the argument that the commercial speech test set forth in *Central Hudson* controls this case. After reviewing the case law, the Court concludes that *Central Hudson* does not apply. *See Goetz,* 149 F.3d at 1139 (it is error to apply the *Central Hudson* test to the Beef Promotion and Research Act). However, assuming the commercial speech test does control this case, the checkoff-funded program passes constitutional muster.

In commercial speech cases, courts apply a four-element analysis. First, the expression must be protected by the First Amendment. Second, the asserted governmental interest must be substantial. If elements one and two are satisfied, a court must apply a third and fourth. Third, the regulation must directly advance the governmental interest asserted. Fourth, the regulation must not be more extensive than is necessary to serve that interest. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

First, the beef checkoff advertising program is not unlawful or misleading, so it comes within the protection of the First Amendment. Second, the asserted governmental interest is substantial. Congress has found that beef production plays a significant role in our nation's economy, and that the maintenance and expansion of existing beef markets is vital to the welfare of beef producers. 7 U.S.C. § 2901(a)(2) and (a)(4). Third, beef checkoff advertising directly advances beef production, as well as the maintenance and expansion of existing beef markets. Fourth, the checkoff program is not more extensive than it needs to be. The Act limits the Beef Board's activities to beef promotion and beef research. The USDA oversees the Beef Board's activities to ensure the activities comply with the Act. In addition, cattle producers and importers are not prohibited from promoting beef independent from the checkoff program. Therefore, the Act passes scrutiny under *Central Hudson. See Frame,* 885 F.2d at 1134 n. 12 (the government's interest in preventing the collapse of the American beef industry is a compelling one, and the Beef Promotion and Research Act is carefully designed to serve that interest).

### C. 7 U.S.C. § 2904(4)(B)(ii)

Further support for the USDA's position can be found in the Act. The Act requires that the Operating Committee develop projects which ensure that segments of the beef industry that enjoy a unique consumer identity receive equitable and fair treatment. 7 U.S.C. § 2904(4)(B)(ii). Apparently, Congress foresaw situations such as the one the Petitioners complain of here. The Petitioners produce grass-fed beef that is free of hormones, subtherapeutic antibiotics, chemical additives, extra water, and irradiation. (Pet. Statement of Uncontroverted Facts ¶ 6). At one point, the Petitioners submitted a proposal to the

Montana Beef Council. The proposal requested $1,000 in checkoff funds to sponsor a Whole Foods Fair, including a lecture on nutrition. The Montana Beef Council rejected the proposal on the basis that no brand or trade name may be referenced in a checkoff-funded project without approval from the Beef Board and the Secretary. *See* 7 C.F.R. § 1260.169(d). .

During the administrative proceedings, the Petitioners alleged that the Montana Beef Council, and ultimately the USDA, had not complied with 7 U.S.C. § 2904(4)(B)(ii). (Answer to Complaint, Admin. R. at 000015; Hearing Memorandum, Admin R. at 000056–57; Memorandum in Support of Proposed Findings of Fact, Conclusions of Law and Order, Admin. R. at 198–200). The Administrative Law Judge did not discuss the issue in detail, but did determine that a failure to properly administrate the Order would not justify refusal to pay assessments. (Decision and Order, Admin. R. at 000241). Likewise, the Judicial Officer that heard the administrative appeal concluded that a violation of 7 U.S.C. § 2904(4)(B)(ii) is not a defense to failure to pay assessments. (Decision and Order, Admin. R. at 000395).

The Administrative Law Judge and the Judicial Officer were correct. If the USDA, the Beef Board, or a Qualified State Beef Council administers the checkoff program in violation of the Act, the Petitioners may be entitled to some form of redress.[8] But such a violation is not a defense to refusal to pay assessments. Regardless, 7 U.S.C. § 2904(4)(B)(ii) is relevant to this suit. The statute supports the constitutionality of the beef checkoff program. When drafting the Act, Congress envisioned that certain niche beef products may not be promoted by checkoff

funds and therefore provided protection for producers who find themselves in the Petitioners' exact situation.

## CONCLUSION

The support for speech compelled by the Beef Promotion and Research Act constitutes support for government speech. Because the government may utilize private speakers to disseminate content-oriented speech, the Act does not violate the rights of free speech or association. The Court bases its decision on different reasoning than that employed by the Administrative Judge or the Judicial Officer. (*See* Decision and Order, Admin. R. at 000237–47; *see* Decision and Order, Admin. R. at 000355–97). Nevertheless, because the Administrative Judge and the Judicial Officer decided the beef checkoff program does not violate the First Amendment, the Court affirms the order to pay the assessments and late fees. Although the Court rules against the Petitioners, they should not be penalized for asserting what they believed was a constitutional right. Considering the merits of the Petitioners' claim, imposition of a $12,000 fine was arbitrary and capricious, and must be reversed.

Accordingly, **IT IS ORDERED THAT:**

1) Petitioner's Motion for a Preliminary Injunction is moot and is dismissed with prejudice;

2) The Court declares the Beef Promotion and Research Act constitutional;

3) Judgment be entered in favor of Respondent United States Department of Agriculture against Petitioner Charters, requiring payment of the administrative assessment of Four

---

8. This issue was not briefed, argued, or even raised before this Court. The Court expresses no opinion on whether 7 U.S.C.

§ 2904(4)(B)(ii) creates the right to bring a private suit, or whether the statute has been violated.

Hundred Seventeen and 79/100ths Dollars ($417.79); and

4) Judgment be entered in favor of Petitioner Charters dismissing the administrative fine of Twelve Thousand and No/100ths Dollars($12,000.00).

The Clerk of Court is directed to enter judgment in accordance with this Order, and notify the parties of the making of this Order.