## In re WASHINGTON STATE APPLE ADVERTISING COMMISSION

### No. CS–01–0278–EFS.

United States District Court, E.D. Washington.

March 14, 2003.

## ORDER GRANTING INTERVENING DEFENDANT'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

SHEA, District Judge.

In 1937, the Washington apple industry envisioned the development and marketing of quality apples to the world. The Washington State legislature shared that vision and created the Washington Apple Advertising Commission, currently known as the Washington State Apple Commission ("the Commission").[1] The enabling statute allowed the Commission to assess one cent on each box of apples packed for fresh market; today's growers pay 25 cents per box. Those assessments pay for retail and export promotions, advertising, communications, and research without which the current dominant penetration of national and international markets by the Washington apple probably would not have been achieved. The Court takes judicial notice of the fact that today the Washington apple is world-renowned as a quality apple. The number of and value of apples produced is evidence of its reputation as a quality apple. In 1999, approximately 88 million 42–pound boxes of apples were sold for fresh market, bringing in approximately $777 million in proceeds to the growers; processed apples brought an additional $78.4 million to the growers.[2] This production of approximately 12 billion apples satisfies over half of the nation's apple demand, and tons are exported to Mexico, Taiwan, Canada, Indonesia, and Europe.

With that homage to the Washington apple industry, the issue presented by the Interveners is whether this mandatory assessment by the Commission violates their and others' First Amendment right of freedom of speech. Understandably, those who created the Commission by the 1937 legislation would not have conceived of the possibility of such a claim. At that time, the United States Supreme Court had not

---

1. Effective July, 2002, the Washington State Legislature amended the statutes governing the Apple Advertising Commission. Those amendments, among other things, changed the name of the Commission to the Apple Commission. RCW 15.24.010. This order will refer to the Commission as the Apple Advertising Commission because in the original caption for this case, that was the Commission's name. Moreover, this Court has previously ordered the caption of this case be amended to In Re Washington Apple Advertising Commission. The Court's use of the old name is for clarity alone, and should not be construed as expressing an opinion on the Commission's activities or the ultimate resolution of this case.

2. Wash. Agric. Statistics Serv., *1999 Washington Agricultural Statistics* (1999).

interpreted the Fourteenth Amendment to incorporate an individual's First Amendment right of freedom of speech and thereby protect it from abridgement by a state. However, in the decades that followed the United States Supreme Court did just that and also identified different types of speech with varying degrees of protection based on different levels of scrutiny. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

On December 9, 2002, the Court heard argument on the Organic Intervening Defendants' Motion for Preliminary Injunctive Relief, (Ct.Rec.101), who were represented at hearing by Brian C. Leighton and David Bohr. The Court also considered the Motion for Preliminary Injunctive Relief filed by Intervening Defendants Borton & Sons, Inc., (Ct.Rec.151), Washington Fruit & Produce Co. and Evans Fruit Co., (Ct.Rec.129), who were represented at the hearing by Brendan V. Monahan, (collectively and in addition to the Organic Intervening Defendants, "The Interveners"). The Commission opposed the motion, represented at the hearing by James M Danielson, and Peter A. Spadoni. The original Defendants appeared at the hearing, represented by Robert Llewellyn Parlette, but did not offer any opinion or argument on the merits of the present motion. This Order **grants** the motions of the Intervenors.

In order to decide the present motion, the Court must address a sequential list of questions, all of which must be answered in the Intervenors' favor before they may demonstrate entitlement to the relief sought. Briefly, the Interveners must show that: (1) the Tax Injunction Act does not apply; (2) they have a likelihood of success on the merits that (2a) the Commission's activities are not government speech; (2b) the *United Foods* analysis applies to the Commission's activities; (2c) the Commission's activities are not a permissible restriction on commercial speech; and (3) given the balance of the hardships and any alleged irreparable injury, the Interveners are entitled to a preliminary injunction. Alternatively, the Interveners are entitled to a preliminary injunction if the Court finds that (1) the Tax Injunction Act does not apply; (2) the Commission's activities violate the Washington Constitution; (3) given the balancing required, the interveners meet the test for a preliminary injunction.

### I. Tax Injunction Act

■ The first question that the Court must address is its own jurisdiction. The Commission [3] asserts that this Court does not have jurisdiction to enter a preliminary injunction restraining its activities because the Tax Injunction Act ("TIA"), 28 U.S.C.

---

3. The Commission repeatedly refers to its objection to this Court taking action like finding the TIA inapplicable, balancing the hardships, or declaring that the mandatory assessments violates the Washington Constitution "without a hearing." At the argument on these motions, the Commission clarified its position to be that when a legislature makes factual findings, a Court may not, under separation of powers principles, reject those findings. While the Court agrees that the Washington State Legislature's factual findings regarding the Commission are entitled to deference, that deference cannot preclude this Court's independent judgment of the facts necessary to decide the constitutionality of the Commission's assessment structure. *See e.g. Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 129, 109 S.Ct. 2829, 2838 106 L.Ed.2d 93 (1989) (holding that while legislative findings are due deference, that cannot foreclose a court's constitutional analysis); *see also Moser v. F.C.C.*, 46 F.3d 970, 974 (9th Cir.1995) (holding that deference to legislative fact finding does not "foreclose the court's independent judgment of the facts bearing on an issue of constitutional law").

§ 1341, precludes this Court from granting the relief sought by the Interveners. If the Commission is correct, then not only does this Court lack jurisdiction to grant a preliminary injunction, but the Court lacks jurisdiction to declare that the Commission's mandatory assessments are unconstitutional, because the TIA also prohibits the issuance of declaratory relief. *See e.g. Nat'l Private Truck Council, Inc. v. Oklahoma Tax Comm'n,* 515 U.S. 582, 588, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995). Accordingly, the Court must first address this challenge to its jurisdiction. The TIA reads:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. The courts have identified two contrasting paradigmatic examples of when the TIA applies and when it does not. "The classic 'tax' is imposed by a legislature upon many, or all citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic 'regulatory fee' is imposed by any agency upon those subject to its regulation. It may serve regulatory purposes directly, by, for example, deliberately discouraging particular conduct by making it more expensive. Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation related expenses." *San Juan Cellular Tel. Co. v. Public Serv. Comm'n,* 967 F.2d 683, 685 (1st Cir.1992) (Breyer, C.J.) (internal citations omitted). The Ninth Circuit has adopted the *San Juan Cellular* three factor test for determining whether an assessment is a tax: (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or

used for the regulation or benefit of the parties upon whom the assessment is imposed. *Bidart Brothers v. California Apple Comm'n,* 73 F.3d 925, 931 (9th Cir. 1996). *Bidart* is almost exactly on point in rejecting the bar of the TIA to a case seeking to enjoin the collection of mandatory assessments by a state-created Apple Commission.

■ *Bidart* 's analysis regarding the entity imposing the assessment stated: "[a]n assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency." *Id.* at 931. *Bidart* identified as relevant to this factor a series of facts about the Commission at issue there: (1) the Commission was created by the legislature who set the initial assessment rate; (2) the Secretary of Agriculture had some control over the Commission's activities; (3) producers who failed to pay could be assessed late penalties or enjoined from marketing; (4) the Commission only came into existence upon a majority vote of the apple producers; (5) the Commission could adjust the assessments; (6) the legislature declared the Commission a corporate body with the power to sue, be sued and enter contracts; (7) the state was not liable for the Commission's act or its contracts; (8) the apple producers retained the right to elect to terminate the commission's existence. In light of these facts, the Court found that "although the current assessment at issue was imposed by the legislature, the independent of the Commission weighs in favor of finding that the assessments are not taxes." *Id.* at 931.

Here, like *Bidart,* the Commission was created by the legislature, RCW 15.24.020, which set the initial assessment rate, RCW 15.24.100. Unlike *Bidart,* the secretary of agriculture does not appear to maintain any control over the Commission's activities because the Commission is composed

only of apple producers and dealers, RCW 15.24.020, and no provision exists that allows the State of Washington to alter or require Commission activity exists. While the Director of the Commission is an *ex officio* member of the Commission, RCW 15.24.020, he is a non-voting member, *id.*, with no power to veto or reject the Commission's activities. Similar, though not identical, to *Bidart*, is the provision allowing criminal prosecution of producers who fail to pay, RCW 15.24.180; 15.24.200. The Commission here was not created by vote of the apple producers. The Commission, and not the legislature, can adjust assessments using a statutory procedure, RCW 15.24.090. The Commission is a corporate body, with the powers of a corporate body, including that to sue and be sued. RCW 15.24.070. The State of Washington is not liable for the Commission's actions. RCW 15.24.190. The Producers do not have the option to terminate the Commission. The balance of facts is not markedly different than in *Bidart*, and thus Bidart's reasoning that the independence of the Commission weighed against the finding of a tax applies here as well.

*Bidart* analyzed the second factor to hold that "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Id.* at 931. Here, the assessments are only imposed on all apple growers and packers of fresh apples in the State of Washington. RCW 15.24.100. The Apple Commission believes that *Bidart* is distinguishable because the California Apple Commission at issue there only imposed assessments on large growers. However, *Bidart* applied the second factor by saying: "The Commission assessments in the case at bar are imposed only upon apple producers. This narrow imposition weighs in favor of Bidart, but like the nature of the entity imposing the assessment, is not dispositive." *Id.* at 932 (citations omitted). *Bidart* found relevant not

that the assessments were imposed on only large apple producers as opposed to all apple producers, but that the assessments were imposed only on apple producers, and not on all citizens, or even all agricultural producers. Like in *Bidart*, this factor must weigh against application of the TIA because like *Bidart*, the Commission's assessments are only imposed on growers and packer of apples.

In *Bidart*, although the court found that the first two factors weighed against finding the TIA applicable, it noted that the third factor is most telling: "[w]here the first two factors are not dispositive, courts examining whether an assessment is a tax 'have tended … to emphasize the revenue's ultimate use.' Assessments treated as general revenues and paid into the state's general fund are taxes." *Bidart*, 73 F.3d at 932. The Commission assessments here are not treated as general revenue and are not paid into Washington's general fund.

By contrast, "[a]n assessment placed in a special fund and used only for special purposes is less likely to be a tax." *Bidart*, 73 F.3d at 932. The Commission is charged with the following purpose:

> [T]he commission shall provide for and conduct a comprehensive and extensive research, advertising, and educational campaign as continuous as the crop, sales, and market conditions reasonably require. It shall investigate and ascertain the needs of producers, conditions of the markets, and extent to which public convenience and necessity require research and advertising to be conducted.

RCW 15.24.080. The assessments pursue those goals: "All moneys collected hereunder shall be expended to effectuate the purpose and objects of this chapter." RCW 15.24.100. The Court finds that the

assessments are placed in a special fund which is to be used for specific purposes.

However, *Bidart* stated that "even assessments that are segregated from general revenues are 'taxes' under the TIA if expended to provide 'a general benefit to the public.'" *Bidart*, 73 F.3d at 932. The Commission argues that because the purpose of its activities, nominally, is to "benefit the people of this state, the state's economy and its general tax revenues," RCW 15.24.080, and because of apple production is central to the Washington economy, the assessments are expended to provide a general benefit to the public. *Bidart* rejected the California Apple Commission's argument along these lines:

> The Commission points to, *inter alia,* the legislative finds that the industry "provides substantial and necessary revenues for the state and employment of its residents," Food Code § 75501, and the statute's purpose to protect "the health, peace, safety, and general welfare of the people of [California]," *id.* § 75503, and "educate and instruct the public with respect to the uses, healthful properties, and nutritional value of apples". *Id.* § 75594.
>
> Such an indirect benefit does not make the Commission's expenditure a tax.... The indirect benefit that may accrue to California's general populace through increased demand for apples as a result of advertising or education is not the type of public benefit that makes an assessment a tax.

*Id.* at 932–33. The Commission's proffered distinction from *Bidart* is a matter of degree, not kind. While it might be true that the apple industry in Washington is more central to the state's economic health and tax revenue than in California, *Bidart* rejected this *type* of benefit as the sort of

thing that makes a tax: the benefit is an indirect effect of the direct purpose to promote in-state apples, regardless of how large the indirect effect might be. For these reasons, the TIA does not apply.

## II. Standard for a Preliminary Injunction

A court may award a preliminary injunction in favor of a plaintiff[4] only if the plaintiff establishes 1) a probability of success on the merits and the possibility of irreparable injury or 2) the existence of serious questions going to the merits and the balance of hardship tips sharply in its favor. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 507 (9th Cir.1988); *Native Vill. of Quinhagak v. United States,* 35 F.3d 388, 392 (9th Cir.1994). These two legal standards are not two separate tests; rather, they are the extremes of a single continuum. *See Benda v. Grand Lodge of Int'l Ass'n of Machinists,* 584 F.2d 308, 315 (9th Cir. 1978). Yet, "[u]nder either formulation of the test, the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity,* 950 F.2d 1401, 1410 (9th Cir.1991). The critical element in determining which part of the continuum applies is the relative hardship to the parties. *See id.* "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.* However, the plaintiff must have at least a fair chance of success on the merits or questions that are serious enough to require litigation. *See id.* Finally, in deciding whether to issue an injunction in which the public interest would

---

4. Here, while the Interveners are denominated as Defendants, this motion puts them in the position of plaintiffs with regard to their counterclaim. As such, they are subject to the legal test for a preliminary injunction applicable to plaintiffs in this motion.

be affected, a district court must expressly consider whether the public interest supports granting the injunction. *See United States v. Oakland Cannabis Buyers' Coop.*, 190 F.3d 1109, 1114 (9th Cir.1999); *accord Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

The Interveners likelihood of success on the merits determines the relative balance of hardships and demonstrable irreparable injury that they must show to obtain relief. Therefore, the Court first addressed whether the Interveners have shown a likelihood of success on the merits.

## III. Likelihood of Success on the Merits

There are three critical legal issues that govern the constitutionality of the mandatory assessments: (1) are the assessments covered by the government speech doctrine; (2) does the Commission satisfy the *Glickman* standard, as modified by *United Foods*; (3) are the Commission's activities permissible regulation of commercial speech? In order to prevail on the test of likelihood of success on the merits, the intervening Defendants would have to prevail on all these questions.

### A. Government Speech

■ In holding assessments imposed under the Mushroom Promotion, Research, and Consumer Information Act unconstitutional, *United Foods* specifically refused to consider the question of whether advertising funded by mandatory assessments is government speech immune from the scrutiny applied to other compelled speech, because the Government did not raise the argument in the Court of Appeals. *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 2341, 150 L.Ed.2d 438 (2001). Here, the Commission asserts that because its activities are Washington State government speech, they are insulated from constitutional scrutiny. The government speech doctrine allows the government, when it elects to speak, to control its own message and make policy judgments about what it will say without offending the First Amendment rights of those who disagree with the government's message:

> It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies.

*Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Thus, when speech can be characterized as government speech, the government may fund that speech without free speech concerns. There are two possible ways in which the Commission's activities might be characterized as government speech: (1) the Commission itself might be a Washington State government entity in the same way as a school board constitutes a government entity; or (2) the Commission might be an entity charged by the Washington State government with disseminating that government's speech.

■ The Court rejects the first possibility. The Commission is a corporate body, with the powers of a corporate body, including that to sue and be sued. RCW 15.24.070. The State of Washington is not liable for the Commission's debts or actions. RCW 15.24.190. As discussed below, the Commission is not answerable to the State of Washington, or any of its

political subdivisions. In the most analogous case, *Keller v. State Bar of California*, 496 U.S. 1, 11–13, 110 S.Ct. 2228, 2234–35, 110 L.Ed.2d 1 (1990), the Supreme Court rejected California's assertion that the State Bar was a government entity whose activities were protected by the government speech doctrine. *Keller* based that rejection on several distinctions between the State Bar and other governmental entities: (1) the principal funding for its activities came from dues levied on its members; (2) its membership was restricted to lawyers admitted to practice in the state, who were required to join; and (3) while it performed important tasks to regulate the profession, its services in that regard were advisory in nature because the actual enforcement was reserved to the State Supreme Court. *Id.* Applying those factors here, the Court concludes that the Commission is not a government entity. Like the State Bar, the Commission's funding comes exclusively from its assessments levied against those eligible to participate in its activities. RCW 15.24.100. Similar to the requirements of and for admission to the State Bar, only apple growers, producers and dealers may be members of the Commission. RCW 15.24.020. Finally, while the Commission is nominally granted the power to enforce and prosecute violations of its chapter, RCW 15.24.070, county and state law enforcement officers are charged with enforcement, RCW 15.24.180, while the state superior courts are vested with jurisdiction to prevent and restrain violations. RCW 15.24.210. Thus, like the State Bar, actual enforcement is reserved to the state courts, not the Commission. For these reasons, the Court concludes that the Commission is not a government entity.

■ The Court also rejects the second possibility. The Supreme Court has recognized that where:

the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.

*Lebron v. National R.R. Corp.*, 513 U.S. 374, 400, 115 S.Ct. 961, 974–75, 130 L.Ed.2d 902 (1995). A prerequisite for characterization as a private entity charged with disseminating the Government's speech is government control of the entity. Here, the Government retains virtually no control over the Commission. Unlike *Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003 (9th Cir.2000), the government retains no authority to edit, change, or censor the speech of the Commission's speech. There, a school principal, whose actions were attributable to the Government, was given authority over the content of the bulletin board, even if materials did not need pre-approval before posting. *Id.* at 1006. While the Director of the Commission is an *ex officio* member of the Commission, he is a nonvoting member, with no authority over advertisements and no power to veto Commission decisions. By contrast, the United States Secretary of Agriculture ("Secretary of Agriculture") has final authority over all the activities of the Cattlemen's Beef Promotion and Research Board, a comparable body to the Commission, and actually appoints its members. *See* 7 U.S.C. § 2904(1) (giving the Secretary of Agriculture the power to appoint the members of the Beef Board);7 U.S.C. § 2904(4)(C) (requiring approval of all budgets, plans and projects, including advertising, by the Secretary of Agriculture); 7 U.S.C. § 2904(6)(A) & (B) (requiring approval of contracts to implement plans of the Beef Board by the Secretary of Agriculture). For this reason, the cases ana-

lyzing whether the speech, including advertising, created by the Beef Board using mandatory assessments, is government speech, *see e.g. Charter v. United States Dept. of Agric.*, 230 F.Supp.2d 1121 (D.Mont.2002), are inapposite. The Secretary of Agriculture retains final approval authority for projects, such as advertising, of the Beef Board and appoints the members of the Board. Neither point of control exists in this case. The Washington State government therefore retains no control over the Commission.[5] For that reason, the Commission is not part of the Washington State government, and its activities are not government speech.

## B. Glickman & United Foods

■ In *Glickman v. Wileman Brothers & Elliott, Inc.*, 521 U.S. 457, 117 S.Ct. 2130 138 L.Ed.2d 585 (1997), the Supreme Court upheld a series of marketing orders regulating peaches, pears and plums grown in California. *Id.* at 463, 117 S.Ct. 2130. The Court articulated the test to be that while assessments used to fund a collective program created by a valid compelled association may sometimes be used to pay for speech over the objection of some members, they could not be used to fund speech activities not germane to the purpose for which the compelled association is justified. *Id.* at 473, 117 S.Ct. 2130.[6] The Court applied that test, finding it "clearly satisfied in this case because (1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological

activities." *Id.* The Court thus found that the constitutional test applicable to such programs is not based on the more stringent First Amendment doctrines, because the mandatory assessments are "a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." *Id.* at 477, 117 S.Ct. at 2142. *Glickman* thus established that, at least in that factual setting, the assessments were not speech restrictions, but were, instead, economic regulations.

In *United Foods*, the Court limited its holding in *Glickman* to those cases where the assessments were best viewed as economic regulation and not compelled speech. "In *Glickman*, the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme." *United States v. United Foods, Inc.*, 533 U.S. 405, 121 S.Ct. 2334, 2338–39, 150 L.Ed.2d 438 (2001). The Court went on to distinguish *Glickman:*

> In *Glickman* we stressed from the very outset that the entire regulatory program must be considered in resolving the case. In deciding that case we emphasized "the importance of the statutory context in which it arises." The California tree fruits were marketed "pursuant to detailed marketing orders that ha[d] displaced many aspects of independent business activity." Indeed,

---

5. Because the Washington State Secretary of Agriculture has no actual power to affect the Commission's decisions, the Court need not pass on the argument made in *U.S. v. Frame*, 885 F.2d 1119 (3rd Cir.1989), that a nominal power to appoint and approve activities did not create government speech because the Secretary merely rubber stamped the decisions of the relevant industry.

6. There, as here, no one disputes the validity of the compelled association. The state may create an association to promote the agricultural products of its economy; it may also require that all producers be members of that association. The question here is whether Washington may elect to fund that organization be requiring fees from its members.

the marketing orders "displaced competition" to such an extent that they were "expressly exempted from the antitrust laws." The market for the tree fruit regulated by the program was characterized by "[c]ollective action, rather than the aggregate consequences of independent competitive choices." The producers of tree fruit who were compelled to contribute funds for use in cooperative advertising "d[id] so as a part of a broader collective enterprise in which their freedom to act independently [wa]s already constrained by the regulatory scheme." The opinion and the analysis of the Court proceeded upon the premise that the producers were bound together and required by the statute to market their products according to cooperative rules. To that extent, their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation.

*Id.* at 412, 121 S.Ct. at 2339 (internal citations omitted). By contrast, in the *United Foods* case, the Court found that:

Beyond the collection and disbursement of advertising funds, there are no marketing orders that regulate how mushrooms may be produced and sold, no exemption from the antitrust laws, and nothing preventing individual producers from making their own marketing decisions. As the Court of Appeals recognized, there is no "heavy regulation through marketing orders" in the mushroom market. Mushroom producers are not forced to associate as a group which makes cooperative decisions. "[T]he mushroom growing business ... is unregulated, except for the enforcement of a regional mushroom advertising program," and "the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through

price supports or restrictions on supply."

*Id.* at 412–13, 121 S.Ct. at 2339(citations omitted). Finding *Glickman* distinguishable, the *United Foods* Court found:

We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself. Although greater regulation of the mushroom market might have been implemented under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C. § 601 *et seq.*, the compelled contributions for advertising are not part of some broader regulatory scheme. The only program the Government contends the compelled contributions serve is the very advertising scheme in question. Were it sufficient to say speech is germane to itself, the limits observed in Abood and Keller would be empty of meaning and significance.

The cooperative marketing structure relied upon by a majority of the Court in Glickman to sustain an ancillary assessment finds no corollary here; the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of Abood extends to the party who objects to the compelled support for this speech.

*Id.* at 415–16, 121 S.Ct. at 2340–41.

The principal support for the Commission's argument that, as was the case in *Glickman* and unlike *United Foods*, its assessments exist as part of a broader, comprehensive regulatory scheme is the legislation creating and regulating the Commission. The Washington State Legislature amended the statutes governing the Commission in 2002, and included language that:

The history, economy, culture, and future of Washington state's agricultural

industry involves the apple industry. In order to develop and promote apples and apple products as part of an existing comprehensive scheme to regulate those products, the legislature declares:

.    .    .    .    .

(d) That the apple industry is a highly regulated industry and that this chapter and the rules adopted under it are only one aspect of the regulation of the industry. Other regulations and restraints applicable to the apple industry include:

(i) Washington agriculture general provisions, chapter 15.04 RCW;

(ii) Pests and diseases, chapter 15.08 RCW;

(iii) Standards of grades and packs, chapter 15.17 RCW;

(iv) Tree fruit research, chapter 15.26 RCW;

(v) Controlled atmosphere storage, chapter 15.30 RCW;

(vi) Higher education in agriculture, chapter 28.30 [28B.30] RCW;

(vii) Department of agriculture, chapter 43.23 RCW;

(viii) Fertilizers, minerals, and limes under chapter 15.54 RCW;

(ix) Organic food products act under chapter 15.86 RCW;

(x) Intrastate commerce in food, drugs, and cosmetics under chapter 69.04 RCW and rules;

(xi) Horticultural plants and facilities—inspection and licensing under chapter 15.13 RCW;

(xii) Planting stock under chapter 15.14 RCW;

(xiii) Washington pesticide control act under chapter 15.58 RCW;

(xiv) Farm marketing under chapter 15.64 RCW;

(xv) Insect pests and plant diseases under chapter 17.24 RCW;

(xvi) Weights and measures under chapter 19.94 RCW;

(xvii) Agricultural products—commission merchants, dealers, brokers, buyers, and agents under chapter 20.01 RCW; and

(xviii) The federal insecticide, fungicide, and rodenticide act under 7 U.S.C. § 136; ....

RCW 15.24.900(2). The Commission has also marshaled the opinions of two experts, Jim Jesernig, a former Washington State representative and senator as well as the former Washington State Director of Agriculture, (Ct.Rec.118); and Jonathan W. Field, (Ct.Rec.119), both of whom opine that the Washington apple industry is a highly regulated industry, similar to that in *Glickman.*

■ While the Washington legislature, and the Commission's experts have articulated a wide array of other regulations to which the Washington apple industry is subject, the Court reads *Glickman* and *United Foods* to hold that only a comprehensive economic-based regulatory scheme, which restricts the freedom of its members to market their products, effectively collectivizing the industry, can fit within the *Glickman* ruling. *Delano Farms v. California Table Grape Comm'n,* 318 F.3d 895 (9th Cir.2003), decided after argument on these motions, found the California Table Grape Commission's assessments violated the First Amendment, in light of *United Foods.*[7] The opinion specifically rejected the Table Grape Commission's contention that regulatory schemes, similar to those related to the Commission here, classified it as a *Glickman* case:

> The Table Grape Commission argues that grapes are regulated by various California statutes addressing such mat-

---

7. *Delano Farms* only dealt with the *United Foods/Glickman* issue. It did not address the commercial speech or government speech issues also before the Court here.

ters as testing, equipment and standards for fruit maturity, container standards, federal regulation of grading standards (e.g., what does "extra fancy" mean?), and quality standards for exported grapes. There is a "marketing order" of the collective sort in one location, though not applicable to the issue in the case at bar. Such consumer protection, and information regulations apply to much of the economy, and are far from rising to the level of collectivization that controlled the result in *Glickman*. Id. at 899. Based on *Delano Farms,* the Court concludes that the health, safety and consumer protection regulations identified by the Commission do not render this a comprehensive regulatory scheme.

Further, *United Foods* cited four aspects of the mushroom market that distinguished it from *Glickman*'s comprehensive regulatory scheme: "the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply." 121 S.Ct. at 2339. The Washington market has not been collectivized, subjected to uniform price or subsidized. While the activities of the Commission are exempt from the antitrust laws, RCW 15.24.160 (2002), the Court finds this alone does not carry weight because the reasons why the Commission might need an antitrust exemption do not appear to exist here. The antitrust laws protect against anti-competitive conduct, whether created by agreement among competitors, *see* Sherman Act § 1, or engaged in unilaterally, *see* Sherman Act § 2. The Commission is not empowered to (1) set minimum or maximum price; (2) set minimum or maximum quantity of output; (3) set number of

suppliers; (4) set minimum quality of product; (5) set other terms of sale; (6) limit entry into the market; (7) limit independent advertising by producers; or (8) limit the amount or type of information that can be disseminated. As these are the principal, although certainly not the only, means by which the antitrust laws can be violated by agreements among competitors,[8] the Commission has not shown that its antitrust exemption serves a purpose other than to permit it to analogize its activity to *Glickman* rather than *United Foods.* Given that the other indicators *United Foods* described do not exist here, *see United Foods,* 121 S.Ct. at 2339, the Interveners have demonstrated a likelihood that the they will show that the Apple Commission assessments are not part of broader regulatory scheme because no broader comprehensive market regulations exist to restrict producer autonomy in connection with the Commission's activities.

Like *United Foods,* the Apple Commission's essential purpose appears to be the advertisements and other marketing which it produces. On average, the Commission spends about three quarters of its budget on advertisements and other marketing expenses (Ct. Rec. 131, Decl. of Brendan Monahan, Ex. F.) Thus, the mandatory assessments required are used for the principal purpose of speech, a result *United Foods* prohibits. *See United Foods,* 121 S.Ct. at 2340-41. The Interveners have thus shown a likelihood of success on the merits.

## C. Central Hudson

■ *Central Hudson* set forth the test for restrictions on commercial speech. *Central Hudson Gas & Elec. Corp. v. Pub-*

---

**8.** There has been no suggestion that the Commission has sufficient market power to draw scrutiny for unilateral activity, *Western Parcel Exp. v. United Parcel Service of America, Inc.,* 190 F.3d 974, 975 (9th Cir.1999). Hence the Commission does not need an antitrust exemption to evade Sherman Act § 2 scrutiny. *See id.*

*lic Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Commercial speech, which is "expression related solely to the economic interest of the speaker and its audience," *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2350, receives First Amendment protection, but to a lesser degree than other forms of constitutionally protected expression. *Id.* at 562–63, 100 S.Ct. at 2349–50.

While advertising fits the classical definition of commercial speech in that it does no more than propose a commercial transaction, *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2349, the Commission's mandatory assessments are not a restriction upon the commercial speech of the Interveners like a restriction on their ability to advertise would be. Rather, the objecting apple producers are compelled to pay for commercial speech. *United Foods* specifically left open the question of whether Central Hudson might apply:

> We need not enter into the controversy, for even viewing commercial speech as entitled to lesser protection, we find no basis under either Glickman or our other precedents to sustain the compelled assessments sought in this case.... the Government itself does not rely upon Central Hudson to challenge the Court of Appeals' decision, Reply Brief for Petitioners 9, n. 7, and we therefore do not consider whether the Government's interest could be considered substantial for purposes of the Central Hudson test.

*United Foods*, 121 S.Ct. at 2337–38. However, *Glickman* rejected application of the commercial speech test to compelled speech: "The Court of Appeals fails to explain why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech.

Given the fact that the Court of Appeals relied on *Abood* for the proposition that the program implicates the First Amendment, it is difficult to understand why the Court of Appeals did not apply *Abood*'s 'germaneness' test." 521 U.S. at 474 n. 18, 117 S.Ct. at 2141. The Supreme Court's admonishment of the Ninth Circuit for applying *Central Hudson* to mandatory assessments suggests that the Abood/Glickman/*United Foods* test of germaneness to a purpose aside from the speech is the only test applicable here. Hence, *Central Hudson* would not apply. This conclusion also finds support in the *Central Hudson* test itself. The ends-means fit requires that the restriction on speech not be "more extensive that necessary" to serve the interest. 447 U.S. at 566, 100 S.Ct. at 2351. This presupposes a restriction on speech. Here, the Interveners speech is not being restricted, instead it is being compelled. Because the Commission's assessments do not restrict speech, it is inappropriate to apply the *Central Hudson* test for restrictions on commercial speech.

### D. Washington Constitution

■ The Interveners argue that, even if the Commission passes First Amendment scrutiny, its assessments fail under the Washington Constitution. The Washington Constitution uses different language from the United States Constitution: "Every person may freely speak, write and publish on all subjects being responsible for the abuse of that right." Wash. Const. Article I, Section V.[9] This provision provides no lesser, and sometimes greater, protection that the First Amendment. *O'Day v. King County*, 109 Wash.2d 796, 802, 749 P.2d 142 (1988). Thus, a violation of the First Amendment is always a viola-

---

**9.** The First Amendment provides that "Congress shall make no law ... abridging the

freedom of speech." U.S. Const. amend. I.

tion of the Washington Constitution. As the Court has found that the mandatory assessments violate the United States Constitution, the Court must conclude that the mandatory assessments also violate the Washington Constitution.[10]

## IV. Irreparable injury

The invasion of a constitutionally protected interest constitutes an irreparable injury. *Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). The use of compelled assessments, such as union dues, even temporally, in violation of the First Amendment is an invasion on the dissenter's constitutionally rights. *Ellis v. Brotherhood of Ry. Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984). In *Ellis*, a Union collected dues, but then months later refunded a portion to those who objected to the Union's non-collective bargaining activities. *Id.* The Supreme Court held that this temporary collection of dues, followed by a refund still violated the First Amendment doctrine of *Abood. See id.* Thus, a collection of compelled assessments in violation of First Amendment rights, even temporarily, constitutes an irreparable injury. While the Commission characterizes the Interveners' injury as being purely monetary damage, which is incapable of causing irreparable injury, their argument is predicated on this Court finding that the Interveners have not established a likelihood of success on the merits regarding the constitutionality of the Commission assessments. Above the Court held that the Interveners have shown a likelihood that the assessments are unconstitutional compelled speech. From that holding, it follows that collection of assessments, even

temporarily, violates the First Amendment, which is in irreparable injury. The Court must, given its prior holding, find that the requirement of irreparable injury has been met.

## V. Balance of the Hardships

In deciding whether to grant a preliminary injunction, this Court must consider the balance of the hardships. However, this consideration, rather than determining that no injunction should be issued at all, allocates the relative burden of the party seeking a preliminary injunction: "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.1991). Here, the Commission is correct that the balance of hardships tips decidedly in its favor. The hardship to the Interveners, as distinct from their constitutional injury, should the injunction not be granted, is the payment of money which may be refunded, at least in part. However, the Interveners have made no showing that were they to continue to pay the assessments, any of them would be driven into bankruptcy or other serious financial distress. By contrast, the hardship to the Commission should the injunction be granted is severe. The Interveners are correct that the only necessary injury the Commission would suffer is a small shortfall of projected revenues which the Commission can easily cover many times over with the surplus from prior years. However, if the Commission sought to collect funds from other

10. The Interveners cite a pre-*United Foods* case, *Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468, 101 Cal.Rptr.2d 470, 12 P.3d 720 (2000) which interpreted the free speech provision of the California Constitution, identical to that in Washington, to reach beyond the First Amendment, as interpreted by *Glickman. Id.* at 514, 12 P.3d 720,. They ask the Court to interpret the Washington Constitution similarly. Given the Court's rulings, discussion of this point is unnecessary.

producers after this Court ruled that its collection from the Interveners was unconstitutional, it would face the prospect of Section 1983 lawsuits from any non-intervening apple producer, with the possibility of punitive damages. Given this prospect, the Commission, in its present statutory form, does face a substantial hardship. However, the balance of hardships does not resolve the question of an injunction because the test for a preliminary injunction is a continuum. *Benda v. Grand Lodge of Int'l Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir.1978). While most courts analyzing placement on the continuum observe that a moving party need not make as strong showing on the likelihood of success on merits where the balance of hardships tips decidedly in their favor, the converse must also be true—a moving party may make so strong a showing on likelihood of success that they are entitled to injunctive relief even if the balance of hardships tips against them. Where, as here, the Interveners have shown a strong likelihood of success and a likelihood of irreparable injury, they have demonstrated entitlement to an injunction without regard to the balance of hardships.

## V. Conclusion

The requirements for a preliminary injunction have been met here. The scope of injunction sought by the Interveners would require the Commission to place the assessments levied by the Commission against both groups of Interveners in escrow until after final disposition of this case on the merits. The Court hereby so orders.

Federal Rule of Civil Procedure 65(c) requires the Court, when issuing a preliminary injunction to set a bond amount, "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred, or suffered by any party who is found to have been wrongfully enjoined or restrained." *Id.* While Rule 65(c) seems to require the Court set a bond amount commensurate with the injury suffered by the Commission if wrongfully enjoined, the Ninth Circuit has committed the amount, *if any,* required to the sound discretion of the trial court. *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir.1999). A nominal bond amount appears satisfactory in this case given the Interveners's likelihood of success on the merits and irreparable injury. In conformity with that decision, the Court sets the bond amount to be posted at ten-thousand dollars ($10,000.00). The Interveners shall file either a cash or surety bond in that amount within ten (10) days of the date of this Order. Accordingly,

**IT IS HEREBY ORDERED:**

1. The Organic Intervening Defendants' Motion for Preliminary Injunctive Relief, (Ct.Rec.101), is **GRANTED**.

2. Intervening Defendants Washington Fruit & Produce Co. and Evans Fruit Co.'s Motion for Preliminary Injunctive Relief, (Ct.Rec.129), is **GRANTED**.

3. Intervening Defendant Borton & Sons, Inc.'s Preliminary Injunctive Relief, (Ct.Rec.151), is **GRANTED**.

4. The parties are directed to place all assessments collected from the Intervening Defendants in escrow pending entry of a final judgment in this case.

5. The Intervening Defendants shall post a $10,000 cash or surety bond with the Clerk of the Court within 10 days of this Order.

**IT IS SO ORDERED.** The District Court Executive is directed to

(1) Enter this Order; and

(2) Provide copies to all counsel.